# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES,**

Plaintiff,

v.

**MARCOS RUIZ-COLÓN,**

Defendant.

Crim. No. 25-152 (ADC) (MBA)

## REPORT AND RECOMMENDATION

Defendant Marcos Ruiz-Colón ("Ruiz") moved to suppress the seized firearm, magazines, and ammunition as fruits of an unlawful arrest and search in violation of his Fourth Amendment rights. (ECF No. 46). After challenging his standing,[1] (ECF No. 47, 52), the government asserted that the seizure of the evidence was proper. (ECF No. 55). U.S. District Judge Aida M. Delgado-Colón referred the motion to suppress to me for a report and recommendation. (ECF No. 50). Having conducted a hearing on the matter, (ECF No. 61), for the reasons set forth below, I recommend the motion to suppress be **DENIED**.

## FACTUAL BACKGROUND

After I found that Ruiz had standing to contest the admissibility of the seized evidence, the government presented the testimony of Officer Roberto Muñiz-Lebrón and Ruiz presented his

---

[1] Ruiz responded to the government's lack of standing argument by attaching evidence indicating his grandfather had gifted him the pickup truck he was driving at the time of the traffic stop. (ECF No. 48, 59). At the hearing, Ruiz's sister's testimony corroborated that their grandfather had gifted her brother the truck, and that for years he was the sole driver. (ECF No. 66 at 22-32). After hearing this testimony, the government agreed that her testimony was "very credible" (*Id.* at 32), adding that "she may have proven standing to the vehicle" (*Id.* at 33). Without objection from the government, I found that Ruiz had established his standing to challenge the search and seizure. (*Id.* at 32-33). As such, standing is no longer at issue.

1

sister's, Nicole Ruiz-Colón's, testimony. Their testimonies are synthesized below.

1. **Officer Muñiz's testimony**

During his direct examination, Puerto Rico Police Bureau (PRPB) Officer Roberto Muñiz-Lebrón testified that, on March 18, 2025, he was on a preventative patrol in an unmarked official vehicle when he saw "a white pickup truck with dark tinted windows, which was a violation of Act 22." (ECF No. 66 at 36-38). After signaling with lights and sirens for the pickup truck to stop, its driver complied and stopped at the edge of the road. (*Id.* at 39). Officer Muñiz approached the pickup truck in plain clothes, but with his credentials visibly hanging from his neck. (*Id.*). The driver, whom he identified as Ruiz, lowered his window. (*Id.*). Officer Muñiz told Ruiz he had stopped him for violating the tinted windows provision of Puerto Rico's traffic laws. (*Id.* at 41). Officer Muñiz asked Ruiz for his license and the car's registration. (*Id.*). In response, Ruiz opened the zipper of a fanny pack he was wearing around his waist. (*Id.* at 41). Officer Muñiz then saw a brown pistol grip with a brown pistol magazine and a second magazine with yellow-colored ammunitions inside the fanny pack. (*Id.* at 41-42).

Upon seeing the firearm Officer Muñiz informed his fellow officer (Officer Lugo) that there was a firearm inside the car. (ECF No. 66 at 42). Officer Muñiz then asked Ruiz if he had a firearms license, to which Ruiz responded "No." (*Id.*). Officer Muñiz proceeded to place Ruiz under arrest for violating Puerto Rico's weapons law. (*Id.*). Officer Muñiz took custody of the fanny pack and waited for a police tow truck to come take the pickup truck. (*Id.* at 43-44). Once it arrived, both Ruiz and his pickup were taken to the Bayamón stolen vehicles unit. (*Id.* at 45).

Once at Bayamón, the pickup truck was left at the designated vehicle lot and Ruiz was taken inside. (ECF No. 66 at 46). Officer Muñiz gave Ruiz a written Miranda rights form, which Ruiz read out loud, confirmed he understood, and signed. (*Id.*). When asked about the firearm, Ruiz responded that he had sold a motorcycle to a friend for $3,000. (*Id.* at 47). The friend paid him $1,500 in cash

2

and covered the balance with the firearm. (*Id.*). Ruiz then admitted that he had test fired the weapon and that "when he pulled the trigger the weapon just emptied itself firing all 17 rounds of ammunition there were in the magazine." (*Id.*). Ruiz also admitted he smoked marijuana daily. (*Id.* at 48). Officer Muñiz filled out the PPR-631.1 form detailing the items collected from the fanny pack: a brown Glock pistol loaded with one round of ammunition in the chamber; a brown Glock magazine that was found inserted in the pistol with 16 9mm rounds of ammunition in it; a second brown Glock magazine with 17 9mm rounds of ammunition in it; a wallet with Ruiz's license, cards, and credit cards, and $141; AirPods; and a phone. (*Id.* at 48).

Next, Officer Muñiz took Ruiz to the lot along with Seargent Nuñez to fill out the PPR-128 inventory form for seized property for Ruiz's pickup truck. (ECF No. 66 at 49). The inventory search only discovered a second phone, an iPhone. (*Id.* at 50). While outside and still with Ruiz and Seargent Nuñez, Officer Muñiz also tested the tinted windows. (*Id.* at 49). The test revealed the window tint to be 3%, a violation of the traffic law which sets a limit of 35%. (*Id.* at 52). Back inside, Officer Muñiz issued a fine for the windows. (*Id.*; GE 5). He requested photographs of the evidence (GE 6), placed Ruiz in the cell, and consulted the case with the pertinent agency. (*Id.*). Finally, Officer Muñiz confirmed that Ruiz did not have a license to carry firearms, making his possession of firearms and/or ammunition a felony under Puerto Rico law. (*Id.* at 52, 56).

On cross-examination, Officer Muñiz was confronted with inconsistencies between his testimony and his sworn statement dated April 1. (ECF No. 66 at 63-66, 70-72). Specifically, regarding the sworn statement indicating he, and not Officer Lugo, was driving the unmarked patrol car. (*Id.* at 71). Counsel for Ruiz then proceeded to do a demonstration, placing the unloaded firearm and magazines in the fanny pack following item placement directions from Officer Muñiz. (*Id.* at 75-92). Counsel then questioned Officer Muñiz's ability to see the contents of the fanny pack when Ruiz opened the fanny pack compartment's zipper. (*Id.* at 92).

Also during his cross-examination, Officer Muñiz testified that he recalled speaking with Ruiz's family members at the stolen vehicles unit. (ECF No. 66 at 94-95). Regarding the timeline, Officer Muñiz testified that after arriving at the station, at around 6PM, he first interviewed Ruiz for about 10-15 minutes, then went outside to inspect the pickup truck and test the windows, and then returned inside. (*Id.* at 95-97). Although he did not remember the time, he recalled having called a federal agent about 2 to 2.5 hours after arresting Ruiz. (*Id.* at 96). He did not record his interview with Ruiz. (*Id.* at 98).

On redirect, Officer Muñiz clarified that he made a mistake when he drafted the sworn statement and swore to it as to him being the driver. (ECF No. 66 at 103-04). He had not realized it was wrong until after the fact when he requested the documents and read them. (*Id.* at 104). The government then revisited Officer Muñiz's vantage point during the traffic stop and ability to see inside the fanny pack once Ruiz pulled the zipper. (*Id.* at 105-06). When questioned by the Court, Officer Muñiz indicated he "saw the grip of the pistol with the magazine when [Ruiz] finished opening the zipper." (*Id.* at 106).

**2. Nicole Ruiz's testimony**

Ruiz's sister, Nicole, who had testified previously on the issue of standing, took the stand again. (ECF No. 66 at 108). Nicole testified that her mother called her to let her know her brother had been arrested. (*Id.* at 109). She went to pick up her sister-in-law and drove to the location where her brother had been arrested. (*Id.*). After seeing her brother's pickup truck on the side of the road but not her brother, she stopped at a Burger King to get him food on the way to the Bayamón stolen vehicles unit. (*Id.* at 110). As she was getting there, she saw in front a patrol car and a tow truck with her brother's truck. (*Id.*). Again, she did not see her brother, so she, her mother (who had arrived separately) and her sister-in-law went to the reception area to ask for Ruiz. (*Id.* at 110-11). They were told he was detained in a cell. (*Id.* at 111). Another officer, whom she described as the boss, told them

4

Ruiz was being interviewed by Officer Muñiz. (*Id.* at 111). After having a conversation with the sergeant, the three women went outside waited on some benches there because it was cold inside. (*Id.* at 111-12). From there they could see Ruiz's truck and they also saw when it was moved to the lot "just next door" where she could still "see it very closely because there was not very much distance." (*Id.* at 113-14). About 30-45 minutes after getting to the station, they saw Officer Muñiz and went inside to talk to him. (*Id.* at 114). Officer Muñiz told them he "had found a magazine with a number of bullets." (*Id.* at 119). Nicole asked about a pistol and Officer Muñiz responded "No, it's a magazine with a number of bullets." (*Id.* at 120). Back outside Nicole saw when some police officers "approached the truck and they placed on top of the hood of the truck like a case, a bag or a case." (*Id.* at 120-21). Once they opened it, she could "see a change in their facial expressions." (*Id.* at 121). Some time later she was able to see her brother at the cell. (*Id.* at 120, 125). She left around 9:15pm. (*Id.* at 122).

### 3. Post-testimony proceedings

Having heard from the witnesses, I asked the parties to repeat the demonstration because I did not have full visibility of the fanny pack as the original demonstration was done with the witness's vantage point in mind. (ECF No. 66 at 126-27). Recognizing that no simulation would be perfect, I stated that during the last simulation "from my vantage point which may or may not be the officer's, I could see the butt of the gun. Perhaps not the fully laid out magazine and the rest of the contents of the bag or the butt *and* the magazine and the rest of the gun, but I did have some view at lest one part of the firearm." (*Id.* at 138). After the second demonstration, the parties presented arguments on their respective positions. (*Id.* at 129-149).

## DISCUSSION

I find that Officer Muñiz testified credibly about the traffic stop and that he was able to see the firearm and at least one magazine and ammunition in plain view. His testimony regarding the

5

tinted window violation for which he decided to stop Ruiz was corroborated by photographs of Ruiz's pickup truck depicting dark windows and the citation he issued for the illegal window tint. (GE 1-5). Indeed, the traffic stop itself has not been challenged. While testifying as to what transpired during the traffic stop, Officer Muñiz's demeanor and focus reflected a credible, vivid, and detailed accounting that led to his discovery of the contraband in plain view. And while he may not have been able to recall specific interactions with bystanders at the location of the arrest, his testimony was clear as to the pertinent details surrounding an arrest that took place eight months prior to the hearing.

I also find that the firearm was within Officer Muñiz's plain view at the time of the traffic stop. "A warrantless seizure is lawful under the plain view doctrine as long as (i) the police officer who effects the seizure lawfully reaches the vantage point from which he sees an object in plain view; (ii) probable cause exists to support his seizure of that object; and (iii) he has a right of access to the object itself." *United States v. Sanchez*, 612 F.3d 1, 4-5 (1st Cir. 2010) (citing *United States v. Allen*, 573 F.3d 42, 51 (1st Cir. 2009); *United States v. Antrim*, 389 F.3d 276, 283 (1st Cir. 2004)). While much time was spent at the hearing as to whether Officer Muñiz could see the contraband in the fanny pack when Ruiz opened it, Officer Muñiz testified credibly that from his vantage point he could. (ECF No. 66 at 41). And he lawfully obtained that vantage point after he pulled Ruiz over for a suspected traffic violation. (*Id.*). Moreover, in the subsequent demonstration, I was, in fact, able to view at least the butt of the firearm inside the fanny pack (*Id.* at 138), further supporting that items within the fanny pack were visible once the zipper was opened. Ruiz had just opened the zipper to get his license when Officer Muñiz saw the contraband. (*Id.* at 41). Finally, once Ruiz responded he did not have a license for the firearm, Officer Muñiz had probable cause to believe Ruiz had committed a felony, arrest him, and seize the contraband to preserve the evidence.

Nicole's testimony does not turn this case to a he said she said situation. That is, while to some extent at odds, affording credibility to one does not disprove the other. According to Nicole, Officer

Muñiz told her he only seized a magazine and ammunition, but not a gun. The government's evidence includes a brown Glock pistol and two matching magazines. (GE 6). Officer Muñiz was not asked about this conversation. Thus, it is unclear if he made a misrepresentation for whatever reason or there was some sort of misunderstanding between the two. Notably, however, if Officer Muñiz had only seized magazines and ammunition at the time of the stop, he could still have lawfully arrested Ruiz because possession of ammunition without a license is a felony under Puerto Rico law. (ECF No. 66 at 56; Art. 6.22 of Puerto Rico's firearm law). Thus, it is hard to infer from Nicole's testimony that Officer Muñiz did not in fact seize the fanny pack with the firearm that he saw during the traffic stop. Next, Nicole testified that she did not see her brother outside the cell and that she could see the pickup truck while she was waiting outside at the station. (*Id.* at 114). Meanwhile, Officer Muñiz testified that after his 10-15 minute interview with Ruiz, he took Ruiz out to the pickup truck to conduct the inventory search. (*Id.* at 49). Again, while seemingly at odds, no timelines were provided for a mismatch. Nor did Nicole say that she had eyes on the vehicle the entire time or that she did not, for example, go inside to use the bathroom in the hours she was there. Moreover, Nicole was originally inside the station and then went outside after talking to reception, the sergeant, and deciding it was cold inside. (*Id.* at 112). And she only testified she could see the pickup truck while outside. (*Id.* at 113). With all of that in mind, I find that Nicole's testimony does not alter the outcome.

## CONCLUSION

For the foregoing reasons, I recommend Ruiz's motion to suppress be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen days of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun.*

*Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**.

In San Juan, Puerto Rico this December 2, 2025.

*s/ Mariana E. Bauzá-Almonte*
MARIANA E. BAUZÁ-ALMONTE
United States Magistrate Judge